UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GALEANA TELECOMMUNICATIONS
INVESTMENTS, INC.,

        Plaintiff,

                                    Case No. 15-cv-14095

v.

                                    HON. MARK A. GOLDSMITH

AMERIFONE CORP., et al.,

        Defendants.

_____/

**<u>OPINION AND ORDER</u>**
**<u>GRANTING IN PART AND DENYING IN PART DEFENDANTS AMERIFONE CORP.</u>**
**<u>AND ISSAM BEYDOUN'S MOTION TO DISMISS (Dkt. 30) AND GRANTING IN PART</u>**
**<u>AND DENYING IN PART DEFENDANT HAROLD OSEFF'S MOTION TO DISMISS</u>**
**<u>(Dkt. 31)</u>**

      This case involves an agreement between Plaintiff Galeana Telecommunications Investments, Inc. and Defendant Amerifone Corporation, under which Amerifone would purchase one of Galeana's subsidiary telecommunication companies if Galeana was able to secure a 3G spectrum license to provide cellular services in the Kingdom of Jordan. Acquiring the license required Amerifone to submit a bid for the license to the Jordanian Telecommunications Regulatory Commission. That bid was ultimately rejected and Galeana brought the present action alleging breach of contract and various claims of fraud.

      Defendants Amerifone and Issam Beydoun filed a motion to dismiss the second amended complaint (Dkt. 30), as did Defendant Harold Oseff (Dkt. 31). For the reasons discussed below, the Court grants in part and denies in part both motions.

# I. BACKGROUND[1]

Plaintiff Galeana Telecommunications Investments, Inc. is in the business of owning and investing in companies operating in the international telecommunications industry.  2d Am. Compl.  ¶¶ 4, 14 (Dkt. 28).   One of these companies was MetroBeam Wireless Telecommunications Co. LLC (operating under the brand name of Kulacom Jordan), which offered non-cellular telecommunications services to individuals and corporations in the Kingdom of Jordan.  Id. ¶¶ 15-16.

In early 2012, Defendant Amerifone Corporation approached MetroBeam to pursue a 3G spectrum license and provide cellular services in Jordan.  Id. ¶¶ 17-18.  After Galeana met with and lobbied several ministers and top officials, the Jordanian Telecommunications Regulatory Commission ("TRC") opened a bidding process for a new carrier to apply for a 3G license and provide cellular services.  Id. ¶¶ 19-22.  The TRC also opened a bidding process for a 4G license. Id. ¶ 22.

Following its successful lobbying efforts, Galeana was approached by several potential investors, including Amerifone, which sought to fund the bidding process and/or purchase MetroBeam.  Id. ¶¶ 23-24.  To that end, Amerifone's attorney, Defendant Harold Oseff, emailed Galeana on April 24, 2012, and submitted a Letter of Intent to purchase MetroBeam for $30 Million on the condition that the Kingdom of Jordan granted MetroBeam the 3G spectrum license.  Id. ¶ 24.

Over the next couple of months, Amerifone persuaded Galeana that it "had the financial and technical ability to consummate a purchase of" MetroBeam.  Id. ¶ 25.  Galeana held meetings once every two to three months with Defendant Issam Beydoun (who is a corporate

---

[1] Because only three Defendants in this case (Amerifone, Beydoun, and Oseff) filed motions to dismiss, the background facts are primarily focused on them.

officer, director, and shareholder of Amerifone) and/or one of Beydoun's representatives.  Id. ¶¶ 9, 26.

During a meeting between Galeana, Beydoun, and Oseff at Oseff's office in late 2012, Defendant Dhafir Dalaly appeared and was introduced as Beydoun's friend.  Id. ¶ 27.  According to Amerifone and Beydoun, Dalaly was the owner and operator of the financial institution Defendant First International Exchange Group, Inc. ("FIEG"), as well as an officer and director of Atlantic Bank, Inc.  Id. ¶ 28.  Dalaly informed Galeana that "FIEG and Atlantic Bank, Inc., were multinational financial institutions that would financially support any deal between [Galeana] and Amerifone[.]"  Id. ¶ 31.

At some point, Atef Tal, the Minister of Telecom and Governor of the Central Bank of Jordan, contacted Galeana regarding his inability to find information about Atlantic Bank, but Amerifone vouched for Atlantic Bank's "legitimacy and financial solvency[.]"  Id. ¶ 33.  According to Galeana, it has since discovered that neither FIEG nor Atlantic Bank was a bank authorized to do business in the United States.  Id. ¶ 32.  Rather, FIEG was a non-banking corporation registered in Michigan; Atlantic Bank was "not a registered entity of any sort[.]"  Id.; see also id. ¶ 88.

While the parties continued to negotiate the purchase price of MetroBeam throughout the remainder of 2012, Defendants reassured Galeana "of their willingness and ability to consummate [the] transaction," id. ¶ 34, with the following:

- Documentation that a similar transaction had been completed in the past.  Id. ¶ 35.

- Documentation of Dalaly's business operations in the region dating back to 1979.  Id.

- In a June 26, 2012 email, Oseff, on behalf of Amerifone, claimed that "it had numerous investors in Jordan, Lebanon

3

and Qatar as well as an investor from the United States willing to" invest up to $100 Million. Id. ¶¶ 36, 63, 89. However, Defendants claimed that the names of the investors could not be shared with Galeana until after the bid was completed because of prior confidentiality and non-disclosure agreements. Id. ¶ 64. According to Galeana, the American investor "never had any intention to invest anything into [the] deal." Id. ¶ 36.

- Defendants stated "that there was a sizeable amount of funds coming from a settlement with the Republic of Lebanon to which one of [Beydoun's] companies was a party to." Id. ¶¶ 36, 65, 89, 104. Galeana refers to this suit as "the Lebanon Lawsuit." Id. ¶ 36. According to Galeana, the Lebanon Lawsuit was dismissed on appeal and certiorari was denied in 2008. Id. ¶¶ 36, 66, 90, 105.

- Dalaly and Oseff provided Galeana with a letter dated August 25, 2012, which stated that "they had established a line of credit for Amerifone" for more than $21 Million for the acquisition of MetroBeam. Id. ¶ 37.

- Oseff forwarded Galeana an agreement between Amerifone and FIEG, in which "FIEG would provide all necessary evidence of financial ability to complete the contemplated transaction." Id. ¶ 38; see also Contract, Ex. B to 2d Am. Compl., at 17-20 (cm/ecf pages) (Dkt. 28-1).

On December 6, 2012, the Kingdom of Jordan officially announced that it would be releasing a bid tender for the 3G and 4G frequencies, after which Galeana and Amerifone began negotiating and drafting a Stock Purchase Agreement. 2d Am. Compl. ¶ 39. On January 8, 2013, the parties entered into a Stock Purchase Agreement (the "Agreement"), whereby Amerifone would purchase 100 percent of the shares of MetroBeam "on the condition that [Galeana] is able to secure the newly announced 3G and 4G operating licenses through the bid process, which process Amerifone would fully fund as per the Agreement." Id. ¶¶ 41, 42; see generally Agreement, Ex. C to 2d Am. Compl., at 22-30 (cm/ecf pages) (Dkt. 28-1).

On February 15, 2013, Oseff sent an email on behalf of Amerifone to Galeana, in which Oseff stated that "funding for the bid had been substantially delayed and as a result, Amerifone

4

requested [Galeana] to pay all expenses in connection with obtaining the bid documents and post any required bid bond." 2d Am. Compl. ¶ 43. A little over four months later, on June 24, 2013, the TRC formally and publicly announced the bid submission process and requirements. <u>Id.</u> ¶ 44.

Based on Oseff's information, Galeana claims that it considered looking at other investors, but that "Amerifone subsequently went to great lengths to continue [to] reassure [Galeana] of its ability and intent to consummate this transaction, largely based around numerous interested investors and financial backing by Dalaly, FIEG and Atlantic Bank." <u>Id.</u> ¶ 45. Galeana further alleges that, once Amerifone learned about other potential investors, Amerifone started to pressure Galeana "to continue to execute the deal." <u>Id.</u> The parties then negotiated and amended the Agreement on September 3, 2013 (the "Amendment"), requiring that "Amerifone solely prepare and submit the bid to the TRC and follow all rules and regulations set forth by the TRC[.]" 2d Am. Compl. ¶¶ 45-46; <u>see generally</u> Amendment, Ex. D to 2d Am. Compl., at 32-33 (Dkt. 28-1). The Amendment also required Amerifone to pay all applicable license fees and to make a partial payment of $10 Million to Galeana "as an initial deposit upon the acceptance of the bid by the TRC." 2d Am. Compl. ¶ 47.

On October 1, 2013, Amerifone submitted a "bank guarantee" for approximately $21,685,000 from Atlantic Bank, which, according to the TRC, was not in a form acceptable to any Jordanian Bank. <u>Id.</u> ¶ 48; <u>see generally</u> Guarantee, Ex. E to 2d Am. Compl., at 35-36 (cm/ecf pages) (Dkt. 28-1). According to Galeana, the bank guarantee was "in clear violation of the TRC requirements," as well as the Agreement and the Amendment. 2d Am. Compl. ¶ 48.

The TRC then notified Amerifone on December 6, 2013 that the "bank guarantee was unacceptable and requested that Amerifone prepare and submit a bid bond from a Jordanian

Bank or, in the alternative, a letter of credit in a form acceptable to a Jordanian bank who would then post a bond as per the rules of the bid, allowing them to cure it within 45 days." Id. ¶ 49. However, Amerifone did not cure the bid, make any attempt to cure the bid, or forward a new bid to the TRC. Id. ¶ 50. On February 24, 2014, the TRC officially rejected Amerifone's bid. Id. ¶ 51.

Galeana filed this action on November 20, 2015, asserting a breach of contract claim against Amerifone and various misrepresentation claims against Amerifone, FIEG, Beydoun, Oseff, and Dalaly. Amerifone, Beydoun, and Oseff then filed their motions to dismiss.

## II.  STANDARD OF DECISION

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009).

## III.  ANALYSIS

### A.  Breach-of-Contract Claim Against Defendant Amerifone

In its second amended complaint, Galeana alleges that Amerifone breached the Agreement and the Amendment when Amerifone failed to satisfactorily submit a bid in accordance with the terms of the Amendment. See generally 2d Am. Compl. at 11-12. As amended, the particular section Galeana alludes to states:

> 4.2  Purchaser [Amerifone] shall prepare and submit a bid to the TRC for the frequencies desired by [Amerifone].  [Amerifone] shall be solely responsible for the depositing of the bid bond amount with a Jordanian Bank within the time permitted by the bid

6

> documents issued by the TRC, and agrees to meet all of the bid
> requirements as established by the TRC of the Kingdom of Jordan,
> on a timely basis.  Notwithstanding the foregoing, in lieu of cash,
> [Amerifone] may post a Letter of Credit in a form acceptable to a
> Jordanian Bank, which, in turn, will issue the bid bond to the TRC.

Amendment at 32 (cm/ecf page).  Galeana alleges that "Amerifone submitted a 'bank guarantee'

from Atlantic Bank, which was not in a form acceptable to any Jordanian Bank according to the

TRC, as part of the bid submission," 2d Am. Compl. ¶ 48; see also ¶ 56 ("Amerifone provided a

bank guarantee which was not from a Jordanian bank, or in the alternative, not in a form

acceptable to a Jordanian bank."), thereby breaching section 4.2 of the Amendment, id. ¶ 58.

And despite TRC's notification that the bank guarantee was not satisfactory, Amerifone did not

cure or attempt to cure the nonconforming bid.  Id. ¶¶ 49, 50, 57.

Amerifone does not appear to challenge these allegations in its motion to dismiss.

Rather, Amerifone argues that, pursuant to a different section of the Agreement, the Agreement

and the Amendment were both rendered null and void when the "TRC rejected their bid for a

telecommunications license."  Def. Amerifone Mot. to Dismiss at 11 (Dkt. 30).  The section at

issue states:

> 6.  Obligations of the Purchaser [Amerifone].  [Amerifone] shall
> deliver to [Galeana] the Purchase Price after the Kingdom of
> Jordan has delivered to [Galeana] the mobile communication
> service license for the frequencies specified in the bid submitted.
> If the Kingdom of Jordan rejects Seller's [Galeana's] bid, all funds
> held in escrow shall be delivered to [Amerifone] within five (5)
> days of rejection, and this Agreement shall be null and void and of
> no further effect.

Agreement at 23 (cm/ecf page).  According to Amerifone, "because the TRC rejected the bid,"

the Agreement and the Amendment became null and void and were no longer enforceable.  Def.

Amerifone Mot. to Dismiss at 12.  Without an enforceable contract, Amerifone asserts that

Galeana cannot maintain its breach-of-contract claim.  Id.

Galeana responds that the "null and void" clause applies if "the Kingdom of Jordan rejects the Seller's [Galeana's] bid." Pl. Resp. to Amerifone Mot. at 10 (Dkt. 39). Galeana then states that the "provision was not triggered because the breach of contract as claimed herein, occurred before the Kingdom of Jordan rejected the bid, and in fact the Defendant's actual breach was the proximate cause of the rejection by the TRC." Id. at 10-11 (emphasis omitted); see also id. ("[T]he breach of contract occurred before the failed bid and in fact caused the bid to fail." (emphasis omitted)).

When construing contractual language, the Court must "give effect to the parties' intention at the time they entered into the contract." Beck v. Park W. Galleries, Inc., 878 N.W.2d 804, 807 (Mich. 2016) (per curiam). Such an undertaking requires the Court to examine the contract's language "according to its plain and ordinary meaning." Id.; see also Rory v. Cont'l Ins. Co., 703 N.W.2d 23, 28 (Mich. 2005) ("In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument."). If the language is clear and unambiguous, the contract must be interpreted and enforced as written. Beck, 878 N.W.2d at 807; Reardon v. Kelly Servs., Inc., 210 F. App'x 456, 459 n.4 (6th Cir. 2006) ("[A] fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written[.]" (quoting Rory, 703 N.W.2d at 30-31). However, an unambiguous contractual provision will not be enforced if it "would violate law or public policy." Rory, 703 N.W.2d at 31.

The test for ambiguity under Michigan law is whether (i) "two provisions 'irreconcilably conflict with each other,'" or (ii) a term is "'equally susceptible to more than a single meaning.'" RBS Citizens Bank, N.A. v. Purther, 22 F. Supp. 3d 747, 752 (E.D. Mich. 2014) (quoting Choates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007)). Whether a

8

contract's language is ambiguous is a question of law, while the meaning of ambiguous language remains a question of fact.  Id.

Further, ambiguity may either be patent or latent.  Shay v. Aldrich, 790 N.W.2d 629, 641 (Mich. 2010).  The former appears from the face of the document and may not be identified with extrinsic evidence, while the latter "exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or choice among two or more possible meanings."  Id.; see also id. ("To verify the existence of latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation.").

Section 4.2 of the Agreement originally stated that the "Seller [Galeana] shall prepare and submit a bid approved by the Purchaser [Amerifone] to the TRC for the frequencies desired by [Amerifone]."  Agreement at 23 (cm/ecf page).  Section 4.2 was then amended, switching the burden to Amerifone to submit the bid.  See Amendment at 32 (cm/ecf page) ("Purchaser [Amerifone] shall prepare and submit a bid to the TRC for the frequencies desired by [Amerifone].").  Because only section 4.2 of the Agreement was amended, see Amendment at 32-33 (cm/ecf pages), section 6 of the parties' Agreement, which clearly states that the Agreement will become null and void "[i]f the Kingdom of Jordanian rejects Seller's [Galeana's] bid," Agreement at 23 (cm/ecf page), remained unchanged.

After reviewing the language in section 6 of the Agreement and section 4.2 of the Amendment, it is certainly possible that there is latent ambiguity present.  Although the terms "Seller" and "Purchaser" are unambiguous, as they are susceptible to only one meaning, and section 4.2 (as amended) and section 6 do not irreconcilably conflict with each other, there still

appears to be some latent ambiguity.  In light of the change to section 4.2, which placed the burden on Amerifone to submit the bid, it is not clear if the parties intended to have their Agreement rendered null and void if the Kingdom of Jordan rejected Amerifone's bid, as opposed to one submitted by Galeana.  On the other hand, it is hard to fathom how section 6 would ever be triggered in this case, as Galeana was no longer required to submit the bid following the Amendment.

However, Amerifone does not contend that there is any ambiguity between section 4.2 and section 6, that "Seller" in section 6 should be interpreted to mean "Purchaser," or provide any extrinsic evidence that would lead to such a conclusion.  See Sault Ste. Marie Tribe of Chippewa Indians v. Granholm, 475 F.3d 805, 812 (6th Cir. 2007) ("The party alleging the ambiguity must carry this burden because a court 'cannot create an ambiguity where none exists.'" (quoting Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d 392, 397 (Mich. 1991))).  Absent extrinsic evidence that section 6 is susceptible to more than one interpretation, the Court in unable to find any latent ambiguity.  See Shay, 790 N.W.2d at 641.  And Amerifone clearly argues that the contract became null and void because the Kingdom of Jordan rejected Amerifone's bid.  Pursuant to the unambiguous language of section 6, the triggering event for the contract to become null and void — the rejection of Galeana's bid — did not occur.  Therefore, the Agreement and Amendment are not null and void.

Amerifone further argues that, even if the contract is not null and void, Galeana "failed to even allege that it was damaged as a result of Amerifone's purported failure to comply with the bid bond requirements."  Def. Amerifone Mot. to Dismiss at 12; see also id. ("Plaintiff has still failed to allege that it suffered any damages that were proximately caused by Amerifone's alleged breach of contract[.]"); Amerifone Reply at 2 (Dkt. 41) (arguing that Galeana did not

allege any damages as a result of the breach because it "has neither alleged that MetroBeam was the high bidder or that its bid would have been accepted by the TRC regardless of any alleged failure by Amerifone"). Although Galeana did not respond to this argument in its response brief, the Court must "conclude beyond a doubt that [Galeana] can prove no set of facts in support of [its] claim that would entitle [it] to relief," before dismissing Galeana's breach of contract claim. Bangura v. Hansen, 434 F.3d 487, 497 (6th Cir. 2006) (citing Carver v. Bunch, 946 F.2d 451, 452 (6th Cir. 1991)).

To state a breach-of-contract claim under Michigan law, the plaintiff must first establish the existence of a valid contract. Eastland Partners Ltd. Partners v. Vill. Green Mgmt. Co. (In re Brown), 342 F.3d 620, 628 (6th Cir. 2003). "Once a valid contract has been established, a plaintiff seeking to recover on a breach of contract theory must then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breach caused the plaintiff's injury." Id.; see also Farha v. Cogent Healthcare of Mich., P.C., ___ F. Supp. 3d ___, 2016 WL 795882, at *7 (E.D. Mich. Feb. 29, 2016) (same).

As noted above, Galeana alleges that Amerifone breached the Agreement and the Amendment by submitting a bank guarantee that was not in an acceptable form to any Jordanian bank. 2d Am. Compl. ¶ 48. When notified of the error, Galeana states that Amerifone did nothing to submit a conforming bid. Id. ¶¶ 49, 50. Galeana then claims that "the TRC officially rejected Amerifone's bid on the basis that Amerifone failed to provide a bid bond from a Jordanian Bank or, in the alternative, a letter of credit in a form acceptable to a Jordanian bank who would then post a bond." Id. ¶ 51. Galeana contends that, because of the breach, it was "unable to mitigate its damages and sell to a third party as the bidding window was closed," id. ¶ 59, and seeks "to recover the full value of the Agreement plus expenses incurred in reliance of,

11

and preparation for, this transaction," id. ¶ 60; see also id. ¶ 71 (expenses include "approximately $4,240,000 in 2012, $5,180,000 in 2013 and $910,000 in 2014 for a total of $10,150,000 on the following items: time spent by management, special consultant teams, travel and accommodations, renting of space, equipment maintenance and rent, spectrum fees, and other expenses").

The Court finds that these allegations, when viewed in the light most favorable to Galeana, reasonably support a plausible link between Amerifone's breach and Galeana's injury. At this stage of the litigation, Galeana does not need to set out in great detail the damages it sustained from the breach. See Plastech Holding Corp. v. WM Greentech Auto. Corp., 14-cv-14049, 2016 WL 93423, at *2 (E.D. Mich. Jan. 8, 2016). The allegations, while sparse, do assert that Galeana was deprived of the "value" of the project and incurred millions of dollars in out-of-pocket expenses. Therefore, Galeana's allegations make it reasonable to conclude that discovery will likely shed light on this element of the breach claim, allowing the issue to be readdressed at summary judgment or trial.

As for failing to allege that Metrobeam would have been the high bidder or would have won the bid, Amerifone offers no authority that such facts are necessary to state a plausible claim for damages. On its face, such a requirement would seem unlikely, given the difficulty a party that did not bid would have in proving that it would have won the bid. A plausible theory is that, by allegedly breaching its contract, Amerifone deprived Galeana of the opportunity to win the bid. In other bidding contexts, such lost opportunity to bid has been recognized as inflicting economic damage that is litigable. See Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich., 470 F.3d 286, 294-295 (6th Cir. 2006) ("[A] prospective bidder's economic interest in a proposal on which it was not allowed to bid constitutes injury-in-fact for the

12

purposes of standing.  Plaintiff's economic injury is well-recognized as sufficient to support standing.").  In the absence of authority dictating a different result, Plaintiff has asserted a plausible theory of damages — and one that does not require asserting that it would have won the bid.

Accordingly, the Court denies this portion of Amerifone and Beydoun's motion to dismiss Galeana's breach-of-contract claim.

### B.  Misrepresentation Claims Against Defendants Amerifone and Beydoun

In its second amended complaint, Galeana brought fraudulent and innocent misrepresentations claims against both Amerifone and Beydoun, arising out of representations about having investors, using settlement funds from a purportedly pending legal action, and having financial backing from Atlantic Bank.  Defendants raise several arguments that Galeana's misrepresentation claims must fail.  The Court considers each in turn.

### 1.  Separate and Distinct Duty

In their motion to dismiss, Amerifone and Beydoun argue that Galeana's misrepresentation claims fail because those claims are based solely upon contractual duties that "all arise out of, or are directly related to, matters governed by the Agreement and the Amendment."  Def. Amerifone Mot. to Dismiss at 14.  In particular, Defendants contend that the misrepresentations "all centered around Amerifone's ability to perform under the Agreement and the Amendment."  Id.  Defendants claim that, without these agreements, Galeana would not have any fraud claims.  Id. at 14-15.  The Court disagrees.

13

In general, a plaintiff cannot maintain a tort action in Michigan for the nonperformance of a contract. DBI Invs., LLC v. Blavin, 617 F. App'x 374, 381 (6th Cir. 2015).[2] This does not mean, however, that all tort claims are barred when there is a contract between the parties. It is well settled under Michigan law that, in those situations, "an action in tort requires a breach of duty separate and distinct from a breach of contract." Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1134 (6th Cir. 1995); Davis v. Venture One Const., Inc., 568 F.3d 570, 576 (6th Cir. 2009); Haas v. Montgomery Ward & Co., 812 F.2d 1015, 1016 (6th Cir. 1987).

This "separate and distinct duty" analysis has its roots in Hart v. Ludwig, 79 N.W.2d 895 (Mich. 1956), a case involving a negligence claim against the defendant for the nonperformance of an oral agreement to care for and maintain the plaintiffs' apple orchard. The Michigan Supreme Court held that the plaintiffs could not maintain their negligence action because the tort required "some active negligence or misfeasance," as opposed to the defendant's nonfeasance. Id. at 897. According to the court, "[t]here must be some breach of duty distinct from breach of contract." Id. In substance, the Hart principle was designed to "relegate[ ] claims of injury to contract law unless there is a tort duty that would exist independent of the duties created by the parties' agreement." Vincent A. Wellman, "Assessing the Economic Loss Doctrine in Michigan: Making Sense out of the Development of Law," 54 Wayne L. Rev. 791, 797 (2008); see also id. at 798 ("The most vulnerable [of] such claims will obviously be suits for the 'negligent' performance of duties that were part of a contract.").

---

[2] Cf. Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236, 239 (6th Cir. 1994) ("Tort law protects society's interest in freedom from harm," while "contract law reflects society's interest in the performance of promises. . . .  Recovery in tort seeks to restore the plaintiff to where he was before the defendant's wrongful conduct injured him, whereas contract law seeks to put the plaintiff where he would be had the defendant properly performed his duty under the contract.")

14

The Hart principle makes sense in the context of a tort claim, like negligence, which is premised on the breach of a legal duty.  Reed v. Netherlands Ins. Co., 860 F. Supp. 2d 407, 416 (E.D. Mich. 2012) (citing Henry v. Dow Chem. Co., 701 N.W.2d 684 (Mich. 2005)).  However, a claim for fraudulent misrepresentations differs in that there is no duty as one of its elements.  Under Michigan law, a plaintiff asserting a claim of common-law fraud must prove the following elements:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

Bennett v. MIS Corp., 607 F.3d 1076, 1100-1101 (6th Cir. 2010) (quoting Cummins v. Robinson Twp., 770 N.W.2d 421, 435 (Mich. Ct. App. 2009) (per curiam)).  Unlike the elements of a negligence claim, the elements of a classic fraud claim do not include a legal duty owed or breach of any duty.[3]  As such, the Hart principle does not apply in this case.[4]

---

[3] While "silent fraud" does involve a duty to disclose, e.g., Hord v. Envtl. Research Inst. of Mich., 617 N.W.2d 543, 550 (Mich. 2000) (per curiam); U.S. Fidelity & Guar. Co. v. Black, 313 N.W.2d 77, 88 (Mich. 1981), Plaintiff does not assert a "silent fraud" theory.  In any case, the legal duty to disclose under a "silent fraud" theory will typically be independent of any contractual duty, because the duty most commonly arises where a party to a transaction has made a truthful reply to the opposing party's inquiry during negotiations but omits material information, Hord, 617 N.W.2d at 550, or the party fails to correct an earlier reply later learned to be erroneous, Black, 313 N.W.2d at 89.

[4] This conclusion is supported by a number of Sixth Circuit cases that have engaged in the "separate and distinct duty" analysis as to certain kinds of tort claims, while not doing so for related fraud claims.  See, e.g., Ram Int'l, Inc. v. ADT Sec. Servs., Inc., 555 F. App'x 493, 500-501 (6th Cir. 2014) (affirming district court's dismissal of plaintiff's negligence claim because it was not based on a duty separate and distinct from defendant's contractual obligations, but affirming the district court's dismissal of plaintiff's fraud claim for other reasons); Bennett, 607 F.3d at 1097-1100 (plaintiff's negligence claim did not assert a duty that was separate and distinct from defendants' contractual obligations but addressing plaintiff's fraud claim under

During oral argument, Defendants' counsel raised a related argument, but one not made in their motion, <u>viz.</u>, the economic loss doctrine prevented Galeana from asserting its fraud claims. Again, the Court disagrees.

The economic loss doctrine, which is judicially created and derived from the Uniform Commercial Code, Quest Diagnostics, Inc. v. MCI WorldCom, Inc., 656 N.W.2d 858, 861 (Mich. Ct. App. 2002), "bars all tort remedies where the suit is between an aggrieved buyer and a nonperformance seller, the injury consists of damage to the goods themselves, and the only losses alleged are economic," Sullivan Indus., Inc. v. Double Seal Glass Co., Inc., 480 N.W.2d 623, 627 (Mich. Ct. App. 1991); Neibarger v. Universal Coops., Inc., 486 N.W.2d 612, 615 (Mich. 1992). Notably, the doctrine only applies to transactions involving the sale of goods. Cargill, Inc. v. Boag Cold Storage Warehouse, Inc., 71 F.3d 545, 550 (6th Cir. 1995) (agreeing with the district court that the economic loss doctrine only applies in situations involving the sale of goods); see also Citizens Ins. Co. of Am. v. Prof'l Temperature Heating & Air Conditioning Inc., No. 300524, 2012 WL 5290289, at *4 (Mich. Ct. App. Oct. 25, 2012) (per curiam) ("[T]he economic loss doctrine would not preclude an action in tort arising from a transaction in services, because these transactions are not governed by Article 2 of the UCC.") (citing Neibarger, 486 N.W.2d at 621). Because the Agreement and Amendment at issue here do not involve the sale of goods, the economic loss doctrine is no barrier to Galeana's fraud claims.

Accordingly, the Court denies this portion of Amerifone and Beydoun's motion to dismiss.

### 2. Merger Clause and Reasonable Reliance

---

Rule 9(b)); Garden City Osteopathic Hosp., 55 F.3d at 1135 (concluding that plaintiff's negligent performance of contract claim did not assert the existence of some duty of care apart from the contractual duty, but addressing plaintiff's fraud claims for statute of limitations purposes concerning an allegation of fraudulent concealment).

In their motion to dismiss, Amerifone and Beydoun argue that Galeana's claims of fraudulent and innocent misrepresentation against them fail, because the Agreement contained a merger clause, which states:

> 12.1 <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.  It supersedes all prior negotiations, letters and understandings relating to the subject matter hereof.

Def. Amerifone Mot. to Dismiss at 15 (quoting Agreement at 25 (cm/ecf page)).[5]  Because Galeana's misrepresentation claims are based upon extra-contractual representations that predate the Amendment, Defendants argue that any reliance upon them was unreasonable given the existence of the merger clause.  <u>Id.</u> at 15-17.

In response, Galeana argues that a "merger clause in a contract will not preclude a claim for fraud 'where the plaintiff shows that it would have avoided the agreement entirely had it known that the defendant's fraudulent representations in fact were false.'"  Pl. Resp. to Amerifone Mot. to Dismiss at 14 (purporting to quote <u>Custom Data Sols., Inc. v. Preferred Capital, Inc.</u>, 274 Mich. App. 239, 243 (Mich. Ct. App. 2006) (per curiam)).[6]  Galeana then claims that it "would have avoided the Agreement entirely had it not been for the Defendants' continuous fraudulent misrepresentations."  <u>Id.</u>

The state of Michigan law is somewhat unsettled regarding the impact of a merger clause on fraud claims premised on parol agreements or representations.  There are cases holding that a merger clause makes any reliance on an oral promise or representation unreasonable per se.  <u>See,</u>

---

[5] The Amendment reaffirmed this merger clause.  <u>See</u> Amendment at 33 (cm/ecf page) ("Other than as modified above, the parties hereby approve, ratify and confirm the terms and conditions of the Stock Purchase Agreement as amended by the First Amendment to Stock Purchase Agreement.").

[6] This quoted portion in Galeana's brief does not appear in the <u>Custom Data Solutions</u> decision.

e.g., Carey v. Foley & Lardner, LLP, No. 321207, 2016 WL 1039538, at *10 (Mich. Ct. App. Mar. 15, 2016) (per curiam) ("A party's reliance on oral promises or representations made before entering into a fully integrated written contract is deemed to be per se unreasonable.") (citing UAW-GM Human Res. Ctr. v. KSL Rec. Corp., 579 N.W.2d 411, 419 (Mich. Ct. App. 1998); Lorenz v. Jeannot, No. 319802, 2015 WL 1931726, at *4 (Mich. Ct. App. Apr. 28, 2015) (per curiam) ("Reliance on an oral promise made prior to entering a fully integrated written agreement is per se unreasonable.") (citing UAW-GM, 579 N.W.2d at 419). Other cases reject that view. See, e.g., Llewellyn-Jones v. Metro Prop. Grp., LLC, 22 F. Supp. 3d 760, 784 (E.D. Mich. 2014) (While "[t]here is some support for the idea that a merger and integration clause renders reliance on pre-contract representations unreasonable per se[,] . . . Michigan courts do not take the point so far."); Skillnet Solutions, Inc. v. Entm't Publ'ns, LLC, No. 12-12173, 2012 WL 6047514, at *5 (E.D. Mich. Dec. 5, 2012) ("Michigan courts, likewise, have not adopted a per se rule making reliance on prior statements unreasonable after a contract containing a merger clause is signed."). Other cases hold that a claim based on fraud in the factum — misrepresenting the nature of the instrument being executed — is not barred by the existence of a merger clause, see Newburgh/Six Mile Ltd. P'ship II v. Adlabs Films USA, Inc., 724 F. Supp. 2d 740, 755-756 and n.7 (E.D. Mich. 2010), while certain fraud-in-the-inducement claims are, see Fleet Bus. Credit, LLC v. Krapohl Ford Lincoln Mercury Co., No. 249825, 2004 WL 2179235, at *2-*3 (Mich. Ct. App. Sept. 28, 2004) (per curiam). Still other cases draw a line between oral agreements and oral misrepresentations of fact, such that fraud claims regarding agreements only are barred. See Star Ins. Co. v. United Commercial Ins. Agency, 392 F. Supp. 2d 927, 928-929 (E.D. Mich. 2005) (Pepe, M.J.).

The Court need not resolve these conflicts, because the merger clause in this case is ambiguous as to its scope. In particular, it is not clear whether it actually embraces pre-contractual representations, as distinct from promises, made by either party. If it does not, the merger clause would not apply under any view of the law, making it unnecessary to adjudicate in this case the contours of Michigan law regarding a merger clause's impact on fraud claims.

"The language of a merger agreement bears relevance to its applicability." Abbo v. Wireless Toyz Franchise, L.L.C., No. 304185, 2014 WL 1978185, at *6 (Mich. Ct. App. May 13, 2014) (per curiam). The merger clause in the Agreement between Galeana and Amerifone only encompasses "all prior negotiations, letters and understandings." Agreement at 25 (cm/ecf page). Arguably, the clause's language does not include prior representations. Similar language has been so construed in both Abbo v. Wireless Toyz Franchise, L.L.C., No. 304185, 2014 WL 1978185 (Mich. Ct. App. May 13, 2014) (per curiam), and Stout v. Withrow, No. 271632, 2008 WL 400695 (Mich. Ct. App. Feb. 14, 2008) (per curiam).

In Abbo, the two merger clauses at issue provided:

> This agreement and the Manuals contain all of the covenants and agreements of the parties with respect to this subject matter, and supercede any and all prior or contemporaneous agreements, whether oral, written, express or implied, between the parties with respect to the subject matter.
>
> *          *          *
>
> This Agreement and all appendices and other documents attached to this Agreement are incorporated in this Agreement and will constitute the entire agreement between the parties. This Agreement supercedes all previous written and oral agreements or understandings between the parties. This Agreement may not be amended or modified except in writing executed by both parties.

2014 WL 1978185, at *5 (emphasis added). Although the clauses disclaimed "any and all prior agreements or understandings," they did not make any reference to prior "representations" or

19

"inducements."   Id. at *6.   Thus, the Michigan Court of Appeals held that the clauses "did not preclude the admission of factual representations regarding matters unaddressed by the contract." Id.

The merger clause in Stout stated:

> We further state that there are no other agreements, oral or otherwise, other than those stated on the Purchase Agreement dated December 10, 2001.

2008 WL 400695, at *8 (emphasis added).   The Michigan Court of Appeals held that, "[b]ecause the integration clause in the instant case did not encompass representations, it does not render plaintiff[']s reliance on the representations unreasonable."   Id.; see also id. ("[T]he merger clause, by its own terms, merged prior 'agreements,' but not prior 'representations.'").

Much like the merger clauses in Abbo and Stout, the merger clause in the Agreement between Galeana and Amerifone does not include any language concerning prior representations. However, discovery may shed light on whether the clause should be interpreted to include representations.   Once the meaning of the merger clause is refined, the Court can revisit the impact of the merger clause on our case upon the filing of a proper motion.

Therefore, at this preliminary pleading stage in the case, the Court denies the portion of Amerifone and Beydoun's motion to dismiss based on the merger clause.

### 3.  Individual Liability of Defendant Beydoun

Beydoun argues that he cannot be held individually liable for any alleged misstatements, because such statements were made on behalf of Amerifone in his representative capacity as chairman.   Def. Amerifone Mot. to Dismiss at 17-18.   In response, Galeana contends that Beydoun can be held individually liable, because he actively and willingly participated in the fraudulent acts against Galeana, regardless of whether or not he was acting on his own behalf or

on behalf of Amerifone.  See generally Pl. Resp. to Amerifone Mot. to Dismiss at 14-16.  The Court agrees with Galeana.

It is well established under Michigan law that, without regard to the doctrine of piercing the corporate veil, corporate officers and agents are personally liable for torts that they personally commit.  See Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121, 125 (6th Cir. 1985) (applying Michigan law); see also Elezovic v. Bennett, 731 N.W.2d 452, 460 (Mich. Ct. App. 2007).  This is true even if the individuals were acting on behalf of the corporation, and even if the corporation itself is liable for the torts.  Id. Galeana has clearly alleged in its second amended complaint that Beydoun is a corporate officer and agent of Amerifone, and that he personally made false representations.  See generally 2d Am. Compl. at ¶¶ 9, 81-102.  Thus, Beydoun may be held personally liable for tortious conduct committed by him, even if he was acting in his capacity as chairman of Amerifone.

Beydoun's argument misses the mark for two major reasons.  First, Beydoun cites two cases involving members of limited liability companies in support of his position that he cannot be held individually liable for fraudulent statements he allegedly made.  However, those cases stand for the proposition that an LLC member cannot be held liable for the company's debts, actions, or obligations.  Duray Dev., LLC v. Perrin, 792 N.W.2d 749, 755 (Mich. Ct. App. 2010) (per curiam) ("Once a limited liability company comes into existence, limited liability applies, and a member or manager is not liable for the acts, debts, or obligations of the company." (emphasis added)); Beggs v. Vitori, No. 295768, 2011 WL 1709831, at *3 (Mich. Ct. App. May. 5, 2011) (per curiam) ("[T]he agreement unambiguously indicate[d] that the contracting party is the limited liability company. . . .  Therefore, defendant [ ] is not individually liable for the

21

company's obligations." (emphasis added)).   These cases do not hold that a corporate officer cannot be held liable for torts that he or she personally committed.

Second, Beydoun cites PHC Michigan, L.L.C. v. Outfitters Association of America, No. 04-73964, 2006 WL 2042515 (E.D. Mich. July 20, 2006) — the only non-LLC case citation — in support of the proposition that, "because [he] was acting solely in his representative capacity on behalf of Amerifone, . . . he is not personally responsible for the entity's obligations[.]"  Def. Amerifone Mot. to Dismiss at 19.  Beydoun patently misinterprets the court's holding in PHC.

In that case, the court recognized (as this Court has above) that, "[u]nder Michigan law, it is well-established that 'the agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort.'"   PHC, 2006 WL 2042515, at *8 (quoting Hartman & Eichhorn Bldg. Co., Inc. v. Dailey, 701 N.W.2d 749, 752 (Mich. Ct. App. 2005)).  The court then proceeded to dismiss the fraud claims against the individual defendant on grounds unrelated to his status as president of the corporation.  See id. (holding that (i) the defendant could not be held individually liable for certain statements because he did not personally make those communications; (ii) the plaintiffs could not sustain a fraud claim based on one of the defendant's letters because they did not show reliance; and (iii) a form signed by the defendant contained future promises to perform, which cannot form the basis of a fraud claim).  Thus, this case does not support Beydoun's argument.

Accordingly, the Court denies this portion of Amerifone and Beydoun's motion to dismiss.

### 4.  Promises of Future Performance and Statements of Opinion

In their motion to dismiss, Amerifone and Beydoun argue that Galeana's claims of fraudulent and innocent misrepresentation against them fail because the representations were either statements related to future performance or statements of opinion.  Def. Amerifone Mot. to Dismiss at 19.  The Court considers each in turn.

### i.  Future Performance

Defendants first argue that "[a]ll of the 'misrepresentations' alleged by Plaintiff in Counts II through V are nothing more than alleged promises by Amerifone that it would perform in the future under the Agreement and Amendment."  Def. Amerifone Mot. to Dismiss at 20.  Defendants then cursorily claim that Galeana's allegations concerning representations "that Amerifone had access to the funds necessary [to] pay MetroBeam's telecommunications license fee and the purchase price for MetroBeam as contemplated by the Agreement and Amendment" were "simply promises that Amerifone would perform its contractual obligations . . . in the future." Id.

In response, Galeana argues that it has viable misrepresentation claims because Defendants are liable for future promises "made without intention of performance."  Pl. Resp. to Amerifone Mot. to Dismiss at 17 (citing Hi-Way Motor Co., 247 N.W.2d at 817).  It also invokes a "fraudulent inducement" theory, under which "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon."  Id. (quoting Samuel D. Begola Servs., Inc. v. Wild Bros., 534 N.W.2d 217, 219 (Mich. Ct. App. 1995)).  Regarding the settling of the Lebanon Lawsuit, Galeana states that it "was told by Defendants and Co-Defendant Harold Oseff that Defendants would be receiving $420 Million with which to fund the current project," and "[t]his 'broken promise' of future conduct was materially misrepresented in order to induce Plaintiff to rely

23

upon it so Plaintiff could continue its relationship with Defendants and alter enter into an Amendment with them." Id. Galeana further claims that "[i]t would be reasonable for Plaintiff to believe information coming from Defendant Oseff, because he is a licensed Michigan attorney with over 40 years of experience working at a large major law firm." Id. at 18.

Under Michigan law, "an action for fraud must be predicated upon a false statement relating to a past or existing fact; promises regarding the future are contractual and do not support a claim for fraud." Bennett, 607 F.3d at 1101; Cook v. Little Caesars Enters., Inc., 210 F.3d 653, 658 (6th Cir. 2000) (same). However, under the "bad faith" exception to this rule, a party may maintain a fraud claim if the "promise [was] made in bad faith without the intention to perform it." Blackward Props., LLC v. Bank of Am., 476 F. App'x 639, 643 (6th Cir. 2012) (applying Michigan law); Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976). Because a broken promise itself is not evidence of fraud, Blackward, 476 F. App'x at 643, "[e]vidence of fraudulent intent . . . must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter," Needa Parts Mfg., Inc. v. PSNet, Inc., 635 F. Supp. 2d 642, 648 (E.D. Mich. 2009). The exact contours of the "fraudulent inducement" theory are not fully settled under Michigan law.

In second amended complaint, Defendants told Galeana "that there were a sizeable amount of funds [$420 Million] coming from a settlement with the Republic of Lebanon to which one of [Beydoun's] companies was a party to." 2d Am. Compl. ¶ 36; see also id. ¶ 65 (on several occasions during 2012 and 2013, "Amerifone represented that a substantial portion of the investment into the transaction was coming from the proceeds of a successful lawsuit by Defendant [Beydoun] against the Country of Lebanon"); id. ¶ 89 ("In May 2013, Beydoun further misrepresented to Plaintiff that one of his companies was to settle the Lebanon

Lawsuit[.]").   The complaint further alleges that Defendants knew that the Lebanon Lawsuit unsuccessfully ended in 2008; that they made the false representations regarding the use of the settlement funds anyway to induce Galeana into the transaction; and that Galeana relied on those representations to its detriment.   Id. ¶¶ 66-67, 90-91.   Concerning representations about the existence of investors, Galeana alleges that there never were any investors to begin with and Defendants knew that fact.   See id.   ¶¶ 63-64, 66-67, 85-86.

As supported by the allegations in the second amended complaint, the bad-faith exception applies in this case because Defendants allegedly acted in bad faith with no present intent to allocate funds from a settlement to the project, because they knew the Lebanon Lawsuit had already been unsuccessfully resolved several years earlier.   Further, the representations about currently having investors related to an existing fact; they are not statements of future conduct. Therefore, these representations survive dismissal.[7]

Accordingly, the Court denies this portion of Amerifone and Beydoun's motion to dismiss.

### ii.  Opinions

---

[7] Whether they survive under the "fraudulent inducement" theory is a more difficult question, principally because Michigan law is somewhat unsettled as to the doctrine's exact contours. There is authority that it is only applicable where a plaintiff seeks to rescind a contract.  E.g., Eby v. A&M Custom Built Homes, Inc., No. 218826, 2001 WL 672141, at *5 (Mich. Ct. App. May 15, 2001) (per curiam) ("[A]ctionable common law fraud [must] be based on a statement relating to a past or existing fact. . . .   However, Michigan also recognizes fraud in the inducement, a claim that appears to be based in contract law rather than tort. . . .   The recovery for this narrower cause of action is more limited, however.   Fraud in the inducement renders a contract voidable at the option of the defrauded party.").   Other decisions recognize it as also allowing recovery of damages.   E.g. Chesterfield Exch., LLC v. Sportman's Warehouse, Inc., 572 F. Supp. 2d 856, 865 (E.D. Mich. 2008) ("Fraud in the inducement renders the contract voidable at the election of the defrauded party . . . and also authorizes damages flowing from reasonable reliance.").   If the former view prevails, the doctrine has no application in our case, as Galeana is not seeking rescission.   Because the representations regarding the future availability and use of the settlement funds can survive dismissal based on the bad-faith exception, the Court need not presently address the "fraudulent inducement" theory.

In their motion to dismiss, Defendants cursorily state that Beydoun's alleged representation that a pending legal action "would be resolved by a settlement in the near future" was "purely a statement of opinion" and did "not relate to any past or existing fact." Def. Amerifone Mot. to Dismiss at 22. Defendants then state, in conclusory fashion, that any "alleged representations regarding Amerifone's ability to secure sufficient financing to pay the licensing fee and the purchase price for MetroBeam" were also statements of opinion. Id. However, Defendants never offer an explanation as to why they believe these latter representations are statements of opinion.

In response, Galeana argues that Defendants' representation that a pending legal action was going to settle, which was based upon Oseff's alleged knowledge, amounted to more than a statement of opinion. Pl. Resp. to Amerifone Mot. to Dismiss at 17. According to Galeana, Oseff is a licensed attorney in Michigan with 40 years of experience and "knew full well that the matter would not be settled." Id. at 18. Galeana then claims that "Beydoun's restatement of the misrepresentation of the Lebanon Lawsuit was known to be in concert with Co-Defendant Oseff." Id. Galeana further states that any representations regarding Atlantic Bank providing financial backing similarly was not a statement of opinion, because the "actual fact that Atlantic Bank is not real can in no way be construed as an opinion." Id.

In their reply, Defendants argue that any liability concerning the existence of Atlantic Bank "fall upon Dalaly only," because "[t]here is no allegation that Beydoun knew that Atlantic Bank was 'not real,' nor that Beydoun warranted or guaranteed anything as to Atlantic Bank." Def. Amerifone Reply at 7. Further, even if "Beydoun opined that he believed Atlantic Bank would be able to provide funding for the project," Defendants argue that such a representation "is nothing more than a non-actionable statement of opinion." Id.

26

In general, an honest statement of opinion cannot support a fraud claim because "[e]xpressions of opinion are not false statements of independently verifiable facts." Johnson v. Botsford Gen. Hosp., 748 N.W.2d 907, 911 n.1 (Mich. Ct. App. 2008); Wilson v. Kiss, 751 F. Supp. 1249, 1256 (E.D. Mich. 1990) ("[U]nder Michigan law, a material representation, as a matter of law, must be a statement of fact — not an expression of opinion[.]"). However, Michigan courts have recognized that when "statements of opinion [are] made in bad faith by one who is possessed with superior knowledge respecting such matters, with a design to deceive and mislead, the party making them must respond." Tocco v. Richman Greer Prof'l Ass'n, 912 F. Supp. 2d 494, 516 (E.D. Mich. 2012) (emphasis in original).

Defendants' statements that a purportedly pending legal action was going to settle cannot be construed as opinions, as the case had already concluded years earlier, and these statements were susceptible to independent verification at the time they were made. Moreover, even if these statements were merely opinions, Galeana alleges that Defendants knew the first lawsuit was completed in 2008 at the time they claimed the case was going to settle in the future, and Defendants allegedly possessed superior knowledge, as the litigation involved one of Beydoun's companies, but Defendants made the statements anyway to mislead and deceive Galeana. Thus, the factual allegations in the second amended complaint support the contention that Defendants did not express good-faith opinions about the settlement.

However, Defendants are correct that Galeana does not allege in its second amended complaint that Beydoun knew Atlantic Bank was neither a domestic nor a foreign bank authorized to do business anywhere in the United States. Nor does Galeana offer any other allegations that Beydoun's opinion about Atlantic Bank investing in the future was made in bad faith.

Therefore, the Court grants in part and denies in part this portion of Defendants' motion to dismiss.  Although Galeana cannot maintain its fraud claims premised on Beydoun's opinion that Atlantic Bank would provide financial backing, Defendants' statements concerning the settlement of the Lebanon Lawsuit may form the basis of a fraud claim.

### 5.  Innocent Misrepresentation and the Inuring of a Benefit

The "innocent misrepresentation" doctrine permits recovery of damages if a "party detrimentally relies upon a false representation in such a manner that the injury inures to the benefit of the party making the representation."  Woodland Harvesting, Inc. v. Ga. Pac. Corp., 693 F. Supp. 2d 732, 743 n.12 (E.D. Mich. 2010); Schwartz v. Elec. Data Sys., Inc., 913 F.2d 279, 285 (6th Cir. 1990) ("Not only must the plaintiff in such a case show that he has suffered an injury; he must also show that the injury inures to the misrepresenter's benefit.").  The loss of the deceived party inures to the benefit of the party making the misrepresentation only when "the defendant obtained what the false representations caused the plaintiff to lose."  Aldrich v. Scribner, 117 N.W. 581, 583 (Mich. 1908); see also State-William P'Ship v. Gale, 425 N.W.2d 756, 761 (Mich. Ct. App. 1988) ("Innocent misrepresentation also requires proof . . . that the plaintiff's injury actually benefited the defendant." (emphasis added)).

In its second amended complaint, Galeana alleges that its injury inured to the benefit of Amerifone because Amerifone "was able to make significant inroads into the Jordanian telecommunications industry without incurring significant costs," and because Amerifone "incurred no liability," unlike Galeana, which "is currently involved in ongoing litigation with the government of Jordan as a result of its failed bid and debts owed to the Jordanian government[.]"  2d Am. Compl. ¶ 79.  Galeana further alleges that Beydoun benefited from Galeana's "substantial economic losses . . . in the pursuit of his fraudulent enterprise."  Id. ¶ 100.

28

In particular, Galeana alleges that Beydoun benefited because he "had no liability risk and as a result Plaintiff is currently in other ongoing litigation . . . and [Beydoun] is not." Id. ¶ 101.[8]

In their motion to dismiss, Amerifone and Beydoun argue that Galeana has not alleged any specific facts that its injury inured to the benefit of either Defendant. Def. Amerifone Mot. to Dismiss at 23. In particular, Defendants argue that Galeana's allegations of "inroads" are "vague," "generalized," and "wildly speculative." Id. at 24. According to Defendants, Galeana has failed to sufficiently allege that Defendants "received any real benefit" from the inroads because there are no allegations that the inroads had any actual value. Id. (noting that Galeana did not allege that Defendants have "obtained any license or contract to conduct business in Jordan," have conducted "any business in Jordan whatsoever," or have "received any financial gain as a result of the inroads").[9]

In its response, Galeana repeats, without citation, that "Defendants benefited from Plaintiff's injury, because as a result of [their] misrepresentations, Plaintiff entered into the Agreement and performed a considerable amount of work including investing substantial capital necessary to obtain a license, while Defendants were able to make significant inroads into the

---

[8] Notably, Galeana alleges in its fraudulent misrepresentation claim against Beydoun that Galeana's injury inured to his benefit because he "was able to make significant inroads into the Jordanian telecommunications industry." 2d Am. Compl. ¶ 95. However, Galeana does not make the same allegation in its innocent misrepresentation claim against Beydoun. On its face, the second amended complaint does not allege that the benefit inuring to Beydoun included any "inroads" into the telecommunications industry; rather, the benefit alleged is that Beydoun had no "liability risk." Id. ¶ 101.

[9] Defendants also claim that any "inroads" made in the Jordanian telecommunications industry ended when the TRC rejected Amerifone's bid on February 24, 2014, the same day as the accrual of Galeana's injury. Def. Amerifone Mot. to Dismiss at 23-24. Defendants contend that any benefits they received from the inroads ended before Galeana suffered any injury and, therefore, Defendants did not receive a benefit that inured from Galeana's injury. Id. at 24. Because the Court grants this portion of Defendants' motion on other grounds, see infra, the Court refrains from addressing this additional argument.

Jordanian telecommunications industry without incurring significant costs."  Pl. Resp. to Amerifone Mot. to Dismiss at 19.  Galeana also claims, without citation, that the injury associated with its "ongoing litigation with the government of Jordan" inured to the benefit of Defendants because they "incurred no liability." Id. at 19-20.

The Court agrees with Defendants.  First, although Galeana claims that Defendants were able to make "inroads" into the Jordanian telecommunications industry, there are no factual allegations specifying what exactly those inroads were, or how Defendants actually benefited from those inroads.  Second, there is no allegation that Defendants obtained what Galeana actually lost — approximately $10 Million in infrastructural investment/improvements, lobbying, and marketing.  See Kerlikowske v. Vill. of Stevensville, No. 206717, 1999 WL 33435655, at *2 (Mich. Ct. App. Sept. 28, 1999) (per curiam) (plaintiffs' loss — a parcel of property worth $75,000 — "became defendant's gain when plaintiffs deeded the property to defendant"); No-Am Corp. v. Steelcase, Inc., No. 199616, 1998 WL 2001186, at *1 (Mich. Ct. App. Jan. 6, 1998) (per curiam) ("[T]he actual damages claimed by plaintiff, the amount of its additional operation costs, which it would not have incurred had it gone out of business earlier, and the amount lost in the liquidation sale, did not inure to the benefit of defendant.  The amount lost by plaintiff did not result in an increase [in] the value of defendant's business.  Defendant did not obtain what plaintiff lost.").  Third, Galeana's expenditure of resources for the venture and entanglement in litigation in Jordan are merely harms to Galeana; they are not benefits to Defendants.  Therefore, Galeana has failed to plead a plausible claim of innocent misrepresentation, and the Court grants this portion of Defendants' motion.

Accordingly, Galeana's innocent misrepresentation claims against Amerifone and Beydoun are dismissed.

### C.  Misrepresentations Claims Against Defendant Oseff

In its second amended complaint, Galeana brought fraudulent and innocent misrepresentations claims against Oseff, based on the following three representations:

- In a letter dated June 26, 2012, Oseff stated that the names of specific investors could not be shared "until after the bid was completed because 'we are subject to Confidentiality and Non-Disclosure Agreements which, for privacy purposes, means that we are not at liberty to reveal the identities of the investors without their written consents.'"  2d Am. Compl. ¶ 107.

- Sometime in May 2013, Oseff informed Galeana that "Amerifone's sister company was to settle the Lebanon Lawsuit" and the approximately $420 Million "was to be used to fund [the] project with [Galeana]."  Id. ¶ 104.

- In an email dated May 13, 2013, Bill Crawford (an agent working on behalf of Oseff) expressed that "Oseff had stated that the Lebanon lawsuit would be resolved by end of that month (May 2013) and that there would be money soon to be used for the purposes of the investment in the license bid[.]"  Id. ¶ 106.[10]

Oseff raises several arguments that Galeana's misrepresentation claims against him must fail.  The Court considers each in turn.

### 1.  Materiality

The first element of a common-law fraud claim is that the defendant made a representation that was material.  Bennett, 607 F.3d at 1100.  Importantly, "the representation need not relate to the sole or major reason for the transaction" to be material.  Zine v. Chrysler Corp., 600 N.W.2d 384, 398 (Mich. Ct. App. 1999).  Rather, materiality requires that the representation relate to an "important fact."  Id.; see also Black's Law Dictionary 1066 (9th ed. 2009) (defining "material" as "[o]f such a nature that knowledge of the item would affect a

---

[10] The second amended complaint does not specifically state to whom either the June 2012 letter or the May 2013 email were sent — a point that Oseff does not raise in his motion — but the implication is that they were both directed to a representative of Galeana.

person's decision-making").   In his motion to dismiss, Oseff argues that two of the alleged representations — his June 2012 letter and his May 2013 statement — are not material.  <u>See</u> Def. Oseff Mot. to Dismiss at 14-15 (Dkt. 31) (challenging only paragraphs 104 and 107 of the second amended complaint, and not paragraph 106, which dealt with Crawford's May 2013 email that was purportedly sent on behalf of Oseff).

First, regarding the June 2012 letter, Oseff states that Galeana's fraud claim is "about the funding necessary to <u>obtain</u> a 3G license in Jordan," as opposed to "the funding necessary to <u>use</u> a 3G license."  <u>Id.</u> at 17 (emphasis in original).  Oseff then contends that the June 2012 letter "made it clear that investors would provide funding <u>only</u> once [MetroBeam] actually obtained permission to purchase a 3G license in Jordan."  <u>Id.</u> (emphasis in original); <u>see also</u> 6/26/2012 Letter (Dkt. 31-4).  According to Oseff, any representations made in the letter only addressed the funding for the use of the license and is, therefore, immaterial and irrelevant to Galeana's fraud claim for obtaining the license.  Def. Oseff Mot. to Dismiss at 17.

Second, regarding his May 2013 statement, Oseff contends that it is immaterial because it concerned the "financial state of Amerifone's 'sister company.'"  <u>Id.</u> at 15.  Because "separate corporations are separate entities with separate assets," <u>id.</u> at 14, Oseff claims that the financial status of the sister company is not "material to Amerifone's financial status," <u>id.</u> at 15.

In response, Galeana argues that the June 2012 letter is material, because it was written "to impress [Galeana] with [Amerifone's] financial strength and induce it into doing business with the Defendants."  Pl. Resp. to Oseff Mot. to Dismiss at 16 (Dkt. 38).  Galeana further argues that the May 2013 statement is material, because Oseff's statement, in essence, provided "that a certain sum of money was on its way from a specific place and was to be used for this very project."  <u>Id.</u> at 16.  The Court agrees with Galeana.

32

As pleaded, the fraud perpetrated in the June 2012 letter concerns the very existence of investors with purported confidentiality agreements, which Oseff allegedly knew to be false. The representation lulled Galeana into believing that Defendants had lined up sufficient financial resources. In essence, the alleged misrepresentation turns on whether investors with impressive financial wherewithal even existed in the first place, which relates to an important fact — Amerifone's financial viability. The June 2012 letter is material.

Oseff's purported use/obtain dichotomy misses the mark, because the letter does not necessarily support his position that it only addressed funding for the use of the license <u>after</u> the license had been obtained. The letter does state that the investors "do not want to finalize and fund these investments <u>until</u> such time as Kulacom/Metrobeam Wireless Corporation has <u>obtained</u> a 3G spectrum license in the Kingdom of Jordan[.]"  6/26/2012 Letter at 2 (cm/ecf page) (emphasis added).  However, the letter goes on to state that "[w]e can assure you that we believe that once Kulacom/Metrobeam Wireless Corporation has written evidence that it has been granted the <u>opportunity to purchase</u> a 3G spectrum license . . . our investors will finalize their commitments to Amerifone Corp. for this matter and <u>fund the required purchase price for the license</u>."  <u>Id.</u> at 2-3 (cm/ecf pages) (emphasis added).  There is facial ambiguity as to what the investors were going to fund.  Based on the foregoing language, the Court cannot find that, as a matter of law, the letter unequivocally states that the investors would not fund Galeana's efforts to obtain the license.

Furthermore, Oseff's May 2013 statement was not merely that the sister company was going to settle a pending legal action, but also that the funds from that settlement were going to be used to fund the transaction between Galeana and Amerifone.  Thus, the statement did not touch only upon the financial state of the sister company; it also directly tied the anticipated

settlement funds with the project itself.   And again, this fact would relate to Amerifone's financial viability, and it would surely affect Galeana's decision-making had it known that the Lebanon Lawsuit had concluded years earlier.

Accordingly, the Court finds that both the June 2012 letter and the May 2013 statement are material and denies this portion of Oseff's motion.

### 2.   Reliance

An essential element of a fraud claim is that the plaintiff acted in reliance on the defendant's false representation.   Bennett, 607 F.3d at 1100-1101.   However, a plaintiff cannot rely on a false statement as an inducement to enter into an agreement if the statement was made after the agreement was executed.   Haas v. Deal, 688 N.W.2d 278 (Mich. 2004); Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 553 (Mich. Ct. App. 1999) (plaintiff could not have relied on false information in signing the contract because the information defendants gave plaintiff occurred after plaintiff signed the contract).

In his motion to dismiss, Oseff argues that Galeana's fraud claims fail because Galeana could not have relied on either of the two May 2013 representations when it entered into the Agreement with Amerifone on January 8, 2013.   Def. Oseff Mot. to Dismiss at 12-13.   Without citation to any authority, Oseff further argues that Galeana could not have relied on the May 2013 representations when the Agreement was amended in September 2013, "because the amendment improved Galeana's position" by affording "greater protections than the original Stock Purchase Agreement."   Id. at 13 (emphasis in original).

In its response, Galeana claims that it relied on Oseff's June 2012 letter concerning investors when it entered into the Agreement in January 2013.   Pl. Resp. to Oseff Mot. to Dismiss at 12.   Galeana further states, without citation, that it relied on the two May 2013

misrepresentations when it (i) entered "into the Amendment" in September 2013, (ii) continued to invest "further marketing and lobbying dollars," and (iii) continued "its efforts without having an opportunity to minimize its ongoing expenses and risks." Id. at 13. Galeana also argues that it considered looking at other investors, but entered into the Amendment after Oseff's "bad-faith reassurances." Id. at 14.

Under Michigan law, Galeana has satisfactorily alleged that it relied on Oseff's June 2012 letter when it entered into the Agreement with Amerifone in January 2013, see 2d Am. Compl. ¶ 110, and Oseff does not appear to challenge this contention. However, Galeana could not have relied on either of the two May 2013 representations when it entered into the Agreement in January 2013. See Novak, 599 N.W.2d at 553.

Although Galeana argues in its response brief that it relied on these later representations when it was induced to enter into the Amendment in September 2013, as well as continue "its efforts" and invest more money, see Pl. Resp. to Oseff Mot. to Dismiss at 13, the second amended complaint does not contain allegations to that effect. Rather, Galeana allegations that conceivably touch upon reliance on these misrepresentations only concern the Agreement. See, e.g., 2d Am. Compl. ¶ 109 ("Defendant Oseff made the misrepresentation with the intention that Plaintiff would act upon it and enter into the Agreement." (emphasis added)); id. ¶ 110 ("Plaintiff relied on the misrepresentation of false investors and the [Non-Disclosure Agreements], and acted in reliance upon the misrepresentations by entering into the Agreement with Defendant Oseff." (emphasis added)); id. ¶ 112 ("As a result of [Oseff's] misrepresentations, Plaintiff entered into this Agreement and suffered an injury because Plaintiff forwent other opportunities on this transaction." (emphasis added)); id. ¶ 113 ("But for Defendant Oseff's misrepresentations, Plaintiff would not have entered into the Agreement."

35

(emphasis added)); id. ¶ 114 ("Defendant Oseff benefited from Plaintiff's injury, because as a result of his misrepresentation, Plaintiff entered into the Agreement and did much of the work necessary to obtain a license." (emphasis added)).

Therefore, the Court finds that Galeana has sufficiently pleaded reliance on the June 2012 letter.   However, Galeana has not sufficiently pleaded reliance on the two May 2013 representations to give rise to a plausible claim of either fraudulent or innocent misrepresentation.

Accordingly, the Court grants this portion of Oseff's motion and dismisses any misrepresentation claims premised on the two May 2013 representations.[11]

### 3.  Causation

According to Oseff's interpretation of the second amended complaint, Galeana alleges that Oseff's "misrepresentations caused [Galeana] to lose a telecommunications license in Jordan." Def. Oseff Mot. to Dismiss at 10.  Oseff argues that Galeana cannot establish causation because "[t]here are no factual allegations in the complaint that plausibly suggest Galeana would have received the telecommunications license 'but for' Oseff's alleged misrepresentations[.]" Id. (emphasis in original).  Oseff further argues that, even if Galeana had asserted that it would have received the license with a properly submitted bond, such "allegations would be nothing more than speculation." Id. at 10-11.

In response, Galeana claims that Oseff made a factual misstatement in his motion.  Pl. Resp. to Oseff Mot. to Dismiss at 8-9.  Galeana contends that its "actual claim is that [it] would

---

[11] Oseff also argues that Galeana failed to plead the "May 2013" representation in paragraph 104 of the second amended complaint with particularly, as required under Federal Rule of Civil Procedure 9(b).  See generally Def. Oseff Mot. to Dismiss at 23-24.  Because the Court dismisses any misrepresentation claim based on that representation for lack of reliance, the Court refrains from addressing this argument.

not have entered into the Agreement or Amendment if it were not for [Oseff's] several misrepresentations," id. at 9, and it "suffered an injury by expending in excess of Ten Million . . . Dollars . . . and also foregoing other opportunities on this transaction," id. at 11-12.  Galeana further argues that the authority cited by Oseff "is outside the bounds of the elements of fraudulent misrepresentation," id. at 9, because "Michigan courts do not require the but for causation in fraudulent misrepresentation cases," id. at 10 (emphasis in original).

Upon review of what was actually alleged in the second amended complaint, the Court agrees with Galeana; there appear to be no allegations in support of the fraud claim against Oseff suggesting that the injury Galeana sustained was the loss of the 3G license or that Oseff caused that loss.  Rather, Galeana clearly alleges that Oseff made false representations, 2d Am. Compl. ¶¶ 104, 106-107, that Oseff knew these representations were false when they were made, id. ¶¶ 105, 111, the representations were made to induce Galeana to enter into the Agreement, id. ¶ 109, Galeana relied on those representations when it entered into the Agreement, id. ¶ 110, and Galeana thereafter suffered an injury because it "forwent other opportunities on this transaction," id. ¶ 112, and because it "expended in excess of [$10 Million] for infrastructural investment/improvements, lobbying, and marketing," id. ¶ 116.  At this stage of the litigation, Galeana has sufficiently pleaded factual allegations to raise a plausible claim of fraud.  Because Oseff's version of Galeana's factual allegations do not actually appear in the second amended complaint, the Court denies this portion of his motion.

### 4.  Innocent Misrepresentation and the Inuring of a Benefit

Oseff raises the same argument as Amerifone and Beydoun: Galeana failed to allege specific facts that plausibly suggest that Oseff benefitted from Galeana's injury.  See generally Def. Oseff Mot. to Dismiss at 17-19.  Because the allegations against Oseff are the same as the

allegations against Amerifone and Beydoun, for the same reasons as stated above, the Court grants this portion of Oseff's motion and dismisses Galeana's innocent misrepresentation claim against Oseff.

### D. Concert-of-Action Claim Against All Defendants

Amerifone and Beydoun argue that Galeana cannot establish any underlying tortious conduct necessary for a concert-of-action claim because Galeana's misrepresentation claims fail as a matter of law. Def. Amerifone Mot. to Dismiss at 24-25. Oseff raises a similar argument. Def. Oseff Mot. at 20-23. For the reasons stated above, Galeana has pleaded sufficient factual allegations of fraud in its second amended complaint against all three Defendants to move beyond the motion-to-dismiss stage of the litigation, and, therefore, the Court denies these portions of Defendants' motions.

### IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants Amerifone and Beydoun's motion to dismiss (Dkt. 30). Insofar as they are premised on Beydoun's alleged opinion that Atlantic Bank would provide financial backing in the future, Galeana's fraud claims against Beydoun are dismissed. The Court further dismisses Galeana's innocent misrepresentation claims against Amerifone and Beydoun. In all other respects, the motion is denied.

The Court also grants in part and denies in part Defendant Oseff's motion to dismiss (Dkt. 31). Insofar as they are premised on Oseff's alleged May 2013 misrepresentations,

Galeana's fraud claims against Oseff are dismissed.  The Court further dismisses Galeana's

innocent misrepresentation claim against Oseff.  In all other respects, the motion is denied.[12]

SO ORDERED.

Dated:  August 10, 2016                          s/Mark A. Goldsmith
      Detroit, Michigan                          MARK A. GOLDSMITH
                                             United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and
any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on August 10, 2016.

                                         s/Karri Sandusky
                                         Case Manager

---

[12] During the hearing, Galeana's counsel requested permission to amend if the Court finds that
the second amended complaint is "insufficient for any form or failure to allege."  This oral
request to amend is insufficient under Federal Rule of Civil Procedure 15, because that rule
requires the filing of a motion.  See Willecke v. Kozel, 395 F. App'x 160, 167-168 (6th Cir.
2010) (district court did not abuse its discretion in not ruling on plaintiffs' request to amend,
contained in their written opposition to summary judgment motion, because no motion to amend
was filed); see also Belizan v. Hershon, 434 F.3d 579, 582-583 (D.C. Cir. 2006) (district court
did not err in refusing to recognize, as a motion to amend, counsel's statement at hearing on
motion to dismiss that he "probably could, if it was required, file another . . . complaint,"
because "Rule 15(a) — even as liberally construed — applies only when the plaintiff actually
has moved for leave to amend the complaint; absent a motion, there is nothing to 'be freely
given'"); E.D. Mich. LR 15.1 ("A party who moves to amend a pleading shall attach the
proposed amended pleading to the motion.  Any amendment to a pleading, whether filed as a
matter of course or upon a motion to amend, must, except by leave of court, reproduce the entire
pleading as amended, and may not incorporate any prior pleading by reference.").  Because
Galeana has not filed a motion to amend with an attached proposed amended pleading, this issue
is not properly before the Court.